(No. 31913.—

JOHN GACA, Appellee, *vs.* THE CITY OF CHICAGO, Appellant.

*Opinion filed January 24, 1952.*

SCHAEFER and HERSHEY, JJ., dissenting.

JOHN J. MORTIMER, Corporation Counsel, of Chicago, (L. LOUIS KARTON, and SYDNEY R. DREBIN, of counsel,) for appellant.

BROOKS & BEARDSLEY, WALKER BUTLER, and DANIEL A. O'ROURKE, all of Chicago, (GRENVILLE BEARDSLEY, of counsel,) for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This appeal, involving the constitutionality of section 1-15 of the Revised Cities and Villages Act, (Ill. Rev. Stat. 1949, chap. 24, par. 1-15,) comes direct from the superior court of Cook County. On March 29, 1949, appellee, John Gaca, filed suit against appellant, the city of Chicago,

to recover the sum of $2300 which represented the amount of a judgment obtained against him by Mary and Edward Mallory in the superior court of Cook County, by reason of their having been falsely arrested. Appellee's right to recovery in this action is predicated upon the foregoing statutory enactment, the pertinent provision being: "In case any injury to the person or property of another is caused by a member of the police department of a municipality having a population of 500,000 or over, while the member is engaged in the performance of his duties as policeman, and without the contributory negligence of the injured person or the owner  *   *   *, the municipality in whose behalf the member of the municipal police department is performing his duties as policeman shall indemnify the policeman for any judgment recovered against him as the result of such injury, except where the injury results from the wilful misconduct of the policeman."

The appellant, the city of Chicago, filed its amended motion to strike, alleging that the statute involved is unconstitutional and void because it contravenes section 22 of article IV of the constitution of the State of Illinois. The trial court, ruling adversely to this claim, entered judgment for the plaintiff and against the city in the sum of $2300 and costs. The defendant stood on its motion to strike.

The statute under consideration undertakes indemnification for injuries to person or property caused by Chicago policemen, who, in the course of their employment, injure another. Injuries resulting from the wilful misconduct of policemen are excepted. It is contended by appellant that this statute is violative of section 22 of article IV of the constitution in that it constitutes a special or local law granting a special privilege and is special legislation applying only to the city of Chicago.

The purpose of section 22 of article IV of the constitution of this State, prohibiting special laws and granting

special privileges, is to prevent the enlargement of the rights of one or more persons and the impairment of, or discrimination against, the rights of others. *Michigan Millers Mutual Fire Ins. Co.* v. *McDonough,* 358 Ill. 575.

Let us quote from appellant's brief so that we may have clearly defined their contentions made upon this subject: "Indemnifying policemen for judgments rendered against them while engaging in a performance of their duties, has no relation to large concentrations of population, organized crime or congested traffic * * *. The fact that some individuals are policemen in Springfield and Evanston, and others are policemen in Chicago, affords no ground for denying indemnity to the policemen of Springfield or Evanston and granting an indemnity to the policemen of Chicago; it affords no ground for granting to Springfield or Evanston an immunity from indemnity while placing on the citizenry of Chicago the financial responsibility to indemnify its policemen. In maintaining law and order within their territorial limits, all municipalities are agents of the State, performing an identical governmental function, and all should receive the same treatment at the hands of the Legislature."

The following principles of law have been announced by this court, which should provide for us a guide in resolving this question. Establishing classifications is primarily a legislative function, and judicial interference is never warranted except for the purpose of ascertaining whether the legislative action is clearly unreasonable. A classification will suffice as a basis for legislation if such classification is based on a rational difference of situation or condition found to exist in the persons or objects upon which the classification rests. Before a court can interfere with the legislative judgment in this case, it must be able to say that there is no fair reason for the law which would not require with equal force its extension to other cities of smaller population which are not affected. (*Hansen* v.

*Raleigh,* 391 Ill. 536.) The legislative classification need not be so broad and comprehensive as to include all the evils which might possibly be brought within its terms. Nor need the classification be scientific, logical, or consistent, provided it is not arbitrary and rests upon a reasonable basis. (*Bagdonas* v. *Liberty Land and Investment Co.* 309 Ill. 103.) Legislation is not special or local because it relates to only one city where the classification, based on population, has a reasonable relation to the purposes and objects of a statute and where the General Assembly could reasonably have concluded that there was a difference of situations and conditions between cities of 500,000 or more and those in cities of smaller populations. *People* v. *City of Chicago,* 349 Ill. 304.

Furthermore, we must bear in mind that there is a presumption that the General Assembly and its committees did their duty, and that they acted conscientiously in making a survey of the conditions prevailing in Chicago and other municipalities in the State before they enacted the present legislation. Quite analogous to the situation presented to us on this appeal was that involved in *People* v. *Kastings,* 307 Ill. 92. That case considered legislation which required indemnity bonds as a condition precedent to the issuance of licenses to operate taxicabs in a city having more than the population specified in the statute, namely, 100,000. At the time of the passage of that statute Chicago was the only city in Illinois with a population in excess of that figure. This court in that case judicially noticed the difference caused by density and concentration of population in traffic conditions and situations in Chicago, as contrasted with smaller cities, and then said "that there is much greater probability of injury to persons and property in the streets of such cities than in the streets of smaller cities." Compelling is the force of the language employed by this court in that case, which appears applicable to our present situation: "The act is not special or

local legislation, within the meaning of the constitution, because it is limited in its application to cities having a population of 100,000 or more. In Illinois there were no cities having a population of more than 100,000 people when this legislation was enacted except Chicago, but the act may apply to any city that shall hereafter have more than 100,000 population. We may take judicial notice of the fact that in cities of more than 100,000 people, like Chicago, the streets and highways are much more congested by pedestrians and various other travelers and by traffic, and that there is much greater probability of injury to persons and property in the streets of such cities than in the streets of smaller cities. There is no objection to the legislation by reason of the fact that at present Chicago is the only city to which this legislation applies, if there is any reasonable basis for such classification. Under the stipulated facts in this case Chicago has 2,700,000 more population than any other city in Illinois. The greater the danger, the greater the necessity for police regulation. It is a fact that greater danger exists in cities of greater population, and that is the very reason for basing the classification on population in this State, and it is sustainable, we think, without question. It is within the power of the legislature to classify cities on the basis of population and enact laws applicable to each class, where there is a reasonable basis for the classification in view of the objects and purposes to be accomplished by the legislation. *People* v. *De Kalb and Great Western Railroad Co.* 256 Ill. 290; *Chicago Terminal Railroad Co.* v. *Greer,* 223 id. 104; *People* v. *Grover,* 258 id. 124; *Douglas* v. *People,* 225 id. 536."

There is little, if any, difference between the indemnity of a taxicab company for payment of judgments for injuries to person and property arising from the negligence of the taxi drivers and requiring the city wherein the taxicabs are operated to provide the same indemnity for injuries to person and property arising from the negligence

of drivers of police vehicles. *Mathews* v. *City of Chicago*, 342 Ill. 120, is another case which is illustrative of the power of the General Assembly to enact legislation where the population factor is controlling. Therein the issuance of bonds to create a working cash fund was authorized for cities having a population of 150,000 or more, for counties having a population of 500,000 or more or for school districts having a population exceeding 100,000. It was contended that this legislation violated the constitution because the acts were local and special laws in relation to cities, county affairs and management of common schools and granting special privileges and immunities in violation of section 22 of article IV of the State constitution. The opinion reads, in part: "There are cities and villages having a small population of a few hundred or a few thousand, with a police force of one or half a dozen or a dozen men, a fire department with a half dozen volunteer firemen or perhaps some paid firemen—a simple organization with small revenue. More than one-third of the counties of the State have less than 20,000 population and less than 500 square miles of territory. The three municipalities which are now affected by the acts under consideration have populations exceeding 3,000,000 people on a little over 900 square miles of territory—more than 3200 to the square mile—with a density of population fifty times as great as the average density in the rest of the State. These municipalities have more than 35,000 employes. The annual revenue of each of them is measured by hundreds of millions of dollars instead of thousands. * * * It is true that there are no other counties, cities or school districts in the class with those which are made defendants in these three suits. There are none very close to the class and there may never be any in the same class, but this does not render the classification void. The conditions there existing furnish a reasonable basis for making the acts in question have effect only in the municipalities to which they

respectively apply, and the acts are therefore valid though similar conditions may never exist in another municipality."

A complete support for our conclusions in this cause can be found in the cases of *Littell* v. *City of Peoria,* 374 Ill. 344, and *People ex rel. Moshier* v. *City of Springfield,* 370 Ill. 541. Therein the court had before it two legislative acts involving a minimum wage of policemen and firemen. It provided for specified minimum wages to employees in municipalities of 10,000 or more population but less than 25,000 and higher wages in municipalities having a population of 25,000 but less than 150,000. Those cases passed upon the constitutionality of each of those acts and passed upon the same questions as are presented here. In upholding the validity of the Policemen's Minimum Wage Act in the *Littell case,* the court said: "The purpose of the act and the extent to which there has been an exercise of the police power cannot be determined solely from an evaluation of the personal benefits accruing to those engaged in police work in the city of Peoria. It must be determined from the character of service police officers are required to render in behalf of the State in the preservation of peace and order. As heretofore pointed out, police protection is a matter of general concern to the whole State. Failure to detect and check crime in the more populous centers might leave the remainder of the State a prey to disorder and violence. The legislature could well conclude that the risk attendant upon the duties of a police officer, the hours that he is subject to call and the general character of service he is required to render, demanded special consideration and that a higher wage would result in securing greater efficiency in the service and more securely protect the peace and order of the whole State."

It would appear, therefore, that this court placed its sanction upon the legislative determination that the hazards and risks of police work were greater in a city of 10,000 to 25,000 than in a smaller community and likewise greater

in cities of 25,000 to 150,000 than in those in the category of 10,000 to 25,000 population.

Relieving the policemen of the city of Chicago of the burden of carrying public liability insurance, which is the effect of section 1-15, indirectly increases their wages. When we consider the high rates in Chicago, as compared with other parts of the State, this saving is no small item. We are asked by the appellant to hold that the legislature transcended its power in providing, by this indirect method, an improvement in the salaries of policemen in that city.

We must constantly be on our guard to prevent a substitution of judicial discretion for legislative judgment. In considering the reasonableness of the classification made by the General Assembly, courts will not attempt to assert their judgment as against the judgment of the General Assembly, nor refuse to uphold legislation merely on the ground that their judgment in this regard differs from that of the General Assembly. The question of classification, as we have said heretofore, is distinctly within the province of the legislature, and this has never been a judicial question except for the purpose of ascertaining whether the legislative action is clearly unreasonable.

Was the legislature, therefore, in the instant case, unreasonable in giving the policemen of Chicago additional security because their problems are essentially different from those of policemen in other cities of Illinois? We do not think that it was unreasonable for the General Assembly to conclude that a policeman's job in the city of Chicago is fraught with hazards uncommon to any other city in Illinois. The people of the State of Illinois are vitally interested in law enforcement in the city of Chicago. By increasing the wages and the security of members of their police department an improvement in the personnel of that law-enforcement agency will surely follow. Preliminary to the passage of the present legislation it must be

presumed that some committee of the legislature made a conscientious study and survey of conditions in Chicago to find out if this legislation was warranted. This investigation would doubtless reveal congestion in travel, both pedestrian and vehicular, causing an uncommon number of automobile accidents; blight and slum areas; areas of unassimilated foreign elements where crimes are bred and protection is offered fleeing criminals; skid rows where poverty, crime and general disrespect for the law abounds; narcotic rings, hoodlums, gangsters, and racketeers that kill with sawed-off shotguns, all of which pose problems on Chicago that are not found in other parts of Illinois.

In this case, a judgment was entered against Gaca as a result of a charge of false arrest. In small towns an alert policeman has a wide acquaintance, and knows practically everyone living in his territory. The chances of his making a mistake in identification are negligible, but the danger of arresting some innocent person in a congested metropolitan area is ever-present. Under the instant law, a metropolitan policeman will not be deterred or restrained in the performance of his duty by the knowledge that, if he makes a mistake, he may be called upon to pay a substantial judgment.

Counsel for appellant also make a contention that because of this law, the tort liability of a policeman will be different in Chicago than in other cities. All that section 1-15 requires is that a municipality of 500,000 or more shall indemnify the policemen for any judgment recovered, while in small localities the policemen must bear the expense of such protection. It does not change the general tort liability of a policeman.

In light of the foregoing observations, we are of the opinion that section 1-15 of the Revised Cities and Villages Act is the product of proper legislative function and is not violative of section 22 of article IV of the constitution of the State of Illinois.

Appellant also urges other grounds in support of his contention that the statute referred to is unconstitutional. We have given them our attention and study, and reach the conclusion that they are without merit and are not of such importance that we would be justified in prolonging this opinion with an analysis of them.

For the reasons heretofore assigned, the judgment of the superior court is affirmed.

*Judgment affirmed.*

SCHAEFER and HERSHEY, JJ., dissenting:

By a long line of decisions the rule has been established that legislation which classifies municipalities upon the basis of population violates the constitutional prohibition against special legislation unless the classification bears a reasonable relation to the objectives which the legislation seeks to accomplish. (*People ex rel. Stuckart* v. *Knopf,* 183 Ill. 410; *L'Hote* v. *Village of Milford,* 212 Ill. 418; *Giebelhausen* v. *Daley,* 407 Ill. 25.) Here, the objective sought to be accomplished is the indemnification of police officers for judgments rendered against them because of nonwilful injuries inflicted in the performance of their duties. The question is whether a classification which retricts the application of the statute to the city of Chicago, alone, is reasonably related to that objective.

The factors relied upon by the majority to sustain the statute are (1) heavier and more congested traffic in Chicago, (2) the relatively wide acquaintance of a policeman in a small town and the resulting diminished likelihood of false arrests due to mistaken identification, and (3) a generalized group of social conditions which are said to exist in Chicago but not elsewhere in the State.

In support of the first of these grounds, traffic congestion, reliance is placed upon *People* v. *Kastings,* 307 Ill. 92, which sustained a statute requiring indemnity bonds as a condition to the issuance of taxicab licenses in cities with

a population of more than 100,000. That case would be in point if the statute before us were confined to indemnification of police officers for injuries due to the operation of automobiles. But it falls far short of the mark when it is relied upon to sustain a statute which imposes a duty to indemnify for *all* negligent conduct of police officers, whether or not that conduct involves the use of an automobile.

The opinion also makes the point that there is less likelihood of false arrests due to mistaken identity in small towns, because an alert policeman in a small town knows practically everyone in his community. There are many municipalities in the State with respect to which that statement is true, although the argument begins to lose reality well before it reaches Evanston, (73,030), Springfield, (80,832), Rockford, (92,503) and Peoria, (111,523). But false arrests do not typically result from mistaken identity. The person arrested is ordinarily the person intended to be arrested. No reported false-arrest case in Illinois has been found which involved an arrest of one person when another was intended to be arrested. Nor is it clear that the arresting policeman is liable in such a situation. The question does not appear to have arisen in Illinois, and there is no unanimity of opinion in those jurisdictions which have passed upon it. See: *O'Neil* v. *Keeling,* 227 Iowa, 754, 288 N.W. 887; *Blocker* v. *Clark,* 126 Ga. 484; *Kittredge* v. *Frothingham,* 114 Me. 537, 96 Atl. 1063, 127 A.L.R. 1057.

Perhaps the majority's enumeration of social conditions which exist in Chicago and not in other parts of Illinois is such obvious hyperbole as not to warrant discussion. Because it seems to be seriously advanced, however, it may be noted that not all of the slum and blighted areas of Illinois are in Chicago. (*Krause* v. *Peoria Housing Authority,* 370 Ill. 356; *St. Clair Housing Authority* v. *Quirin,* 379 Ill. 52; *Springfield Housing Authority* v. *Overaker,* 390 Ill. 403; *Housing Authority of Gallatin County* v.

*Church of God,* 401 Ill. 100.) Nor have "hoodlums, gangsters and racketeers" afflicted Chicago alone. (*People* v. *Birger,* 329 Ill. 352; (Shelton and Birger gangs).) The records of the United States courts deny the statement that narcotic rings are peculiar to Chicago. (Reports of the Administrator of the Federal Courts, Table D3.) With the exception of traffic conditions, the asserted differences between Chicago and the other cities of the State, which are relied upon to sustain the statute, are either nonexistent or irrelevant.

The majority opinion quotes from *Littell* v. *City of Peoria,* 374 Ill. 344, which sustained the validity of a statute fixing minimum wages of policemen according to population classifications. But in that case the court expressly refrained from discussing the objection raised in this case, saying (p. 350): "Defendant's contention that the act is special legislation and violates section 22 of article 4 of the constitution is answered in *People* v. *City of Springfield, supra."* In the *City of Springfield case* (370 Ill. 541, 548,) where the question now before us was considered, the court sustained the Firemen's Minimum Wage Act against attack under section 22 of article IV because "The difference in the cost of living, and in the hazards of the occupation, in municipalities within the two classifications in the act, and in those not embraced within its terms, furnishes a reasonable basis * * * for such a classification. It bears a direct relation to the object and purpose of the legislation."

Of course differences in the cost of living between large and small cities are directly related to the salaries to be paid to policemen and firemen, and so are differences in the hazards of the occupation. But the differences which will sustain the present classification must be those which relate to the obligation imposed upon the taxpayers of a single municipality to indemnify its policemen for the "nonwilful" injuries they inflict in the performance of their duties.

Apparently relying on the minimum wage cases, the majority would support this legislation upon the ground that this statute indirectly brings about "an improvement in the salaries of policemen in that city." Reference is made to relieving policemen of the burden of carrying public liability insurance, and to higher rates charged for such insurance in Chicago than in other parts of the State. Here, again, however, the argument carries only far enough to reach cases·involving automobile accidents, and falls far short of meeting the expanded scope of the present statute. Moreover, there is a vast difference between a statute fixing minimum wages in terms of population classifications which correlate with differences in living costs, and a statute which arbitrarily increases police salaries in a single city, without relation to any relevant consideration. The version of the statute suggested in the majority opinion underscores the serious question which exists under section 10 of article IX of the constitution, which prohibits the General Assembly from imposing taxes upon municipal corporations for corporate purposes. That is the question which the majority does not discuss. In our opinion this constitutional objection is important; it should be squarely faced, and the grounds which underlie the ruling of the majority should be explicitly stated.

Municipalities have not heretofore been liable for the unlawful or negligent acts of policemen in the performance of their duties. (*City of Chicago* v. *Williams*, 182 Ill. 135; *Evans* v. *City of Kankakee*, 231 Ill. 223; *Culver* v. *City of Streator*, 130 Ill. 238.) The policeman, however, has been individually liable for his tort, notwithstanding he commits it while engaged in the performance of a governmental function. (*City of Chicago* v. *Williams*, 182 Ill. 135; *Board of Trustees of Odell* v. *Schroeder*, 58 Ill. 353; *Wisher* v. *City of Centralia*, 273 Ill. App. 168.) These rules of law are altered by the present statute so that the taxpayers of a single city are required to indemnify police-

men for damages caused by their negligence. No similar obligation is placed upon the taxpayers of any other municipality, although the duties performed by municipal policemen are identical throughout the State.

The imposition upon the taxpayers of a single city of a financial burden from which the taxpayers of all other cities in the State are free can be sustained only if the discrimination is warranted by circumstances related to the legislative purpose. Such circumstances, in our opinion, do not exist.