(No. 33052.—

REGINALD DU BOIS, Appellant, *vs.* REDMOND P. GIBBONS, Appellee.—C. ARTHUR CARLSON, Appellee, *vs.* THE CITY OF CHICAGO *et al.,* Appellants.

*Opinion filed March 17, 1954.*

John J. Mortimer, Corporation Counsel, of Chicago, (Charles F. Rathbun, Harry D. Lavery, and John A. Cook, of counsel,) for appellants.

John P. Coghlan, John E. Toomey, John J. Moran, and William M. Gibbons, all of Chicago, for appellees.

Ben W. Heineman, Albert E. Jenner, Jr., Harold A. Smith, Henry F. Tenney, and Austin L. Wyman, all of Chicago, amici curiae.

Mr. Justice Fulton delivered the opinion of the court:

This is a direct appeal from a judgment and a decree entered in the superior court of Cook County in separate actions begun in that court but consolidated by order of the trial court at the time of the entry of final judgment and decree in each case. Both actions involve the activities of the emergency committee on crime of the city council of

the city of Chicago. The appeal is brought directly to this court because the constitutionality of a statute and an ordinance are in question. The questioned statute is section 23-111 of the Revised Cities and Villages Act. (Ill. Rev. Stat. 1953, chap. 24, par. 23-111.) The challenged ordinance created the emergency committee on crime of the city council of the city of Chicago. It was passed on February 14, 1952. The issues in both cases arise upon the pleadings. Final judgment and decree were entered in the superior court after motions to dismiss were sustained in one case and overruled in the other.

On February 13, 1953, Reginald Du Bois, as a member of the city council of the city of Chicago and chairman of the emergency committee on crime of that body, filed his complaint in the court below seeking to compel the defendant, Redmond P. Gibbons, to answer certain questions put to him by the committee concerning his income and property. The complaint alleges in substance that the ordinance was passed pursuant to the authority of section 23-111 of the Revised Cities and Villages Act; that the membership of the committee was established by council resolution, and that Du Bois, a duly elected and qualified member of the council, is the duly appointed chairman; that the committee had begun certain investigations and had heard oral testimony at hearings in connection therewith; that the investigation then being conducted was an investigation of the Chicago police department and particularly of its Thirty-sixth police district, commanded by the defendant as captain from September, 1949, to May 13, 1952; that the hearings had developed that there were certain criminal activities in the district during the incumbency of the defendant, including gambling, prostitution and tavern violations which were open and notorious; that the testimony had indicated that the captain of the district was controlled by persons who in turn controlled these illegal activities; that persons engaged in these activi-

ties were friendly with the police and that the activities apparently were permitted except when supervisory officers of the police department visited the district. The complaint further alleges that the defendant had been examined under oath at a public hearing before the committee; that after denying that he knew certain persons previously connected with illegal activities in the district, defendant further denied that he had received money from these persons or certain of them; that he denied having "received anything of any kind from anybody;" that he was then asked the question: "Starting with the year 1948 and running through to the end of 1952, did you have any income in excess of your salary from any source?"; that defendant refused to answer, stating: "Mr. Rathbun, any questions concerning my privacy I will discuss with you in private. I will gladly discuss it with you in private and if there is anything that is the least bit wrong, I want you to call it to the attention of the commissioner of police but I want my rights to my privacy respected and I don't think I have to discuss my private affairs here in an open meeting." The complaint further alleges that the defendant then refused to answer in a private or executive session of the committee; that the testimony developed constitutes probable cause for inquiry into defendant's financial affairs while captain; that the questions were relevant and necessary and that the committee had authorized the commencement of the suit.

Defendant Gibbons filed a motion to dismiss. It asserts that the statute is unconstitutional because it is special legislation in violation of section 22 of article IV of the Illinois constitution; that in providing for unlimited hearings it subjects citizens' rights to unlimited discretion; that in delegating judicial powers it violates article VI of the State constitution and that the General Assembly cannot delegate the powers enumerated to a single municipal corporation. The motion challenges the validity of the ordi-

nance because it is not within the power delegated by the General Assembly, either expressly or impliedly; because it subjects citizens' rights to unlimited discretion and because it is vague and indefinite, purports to authorize the exercise of power inherent in the State, purports to delegate judicial powers, authorizes impertinent and irrelevant inquiries and authorizes the exercise of powers not possessed by the State or Nation. The trial court sustained the motion to dismiss whereupon plaintiff elected to stand upon the complaint and final judgment was entered against him.

In the other case, plaintiff, C. Arthur Carlson, filed a complaint as a taxpayer against the city of Chicago and the officers and officials named, asserting the unconstitutionality of the statute and ordinance in question and seeking to restrain them from incurring any further expense in connection with the investigations; to enjoin the comptroller from approving the committee's bills; to enjoin him from signing checks on the city treasury and to enjoin the treasurer from honoring checks for committee expense. The defendants filed a motion to dismiss, asserting the constitutionality of the statute and ordinance and that the facts alleged show that the authorities were engaged in an investigation authorized by the enactments of the General Assembly and the city council. The court overruled the motion to dismiss and the defendants then elected to stand upon their motion. The court signed a decree enjoining the further expenditure of money by the emergency committee on crime. Recognizing that the issues in both cases were the same, the trial court ordered the cases consolidated at the time of entry of the final judgment and decree in each case. The propriety of the order of consolidation is not questioned.

The section of the Revised Cities and Villages Act involved in this appeal was enacted by the Sixty-seventh General Assembly and was approved July 2, 1951. It provides

in substance that the corporate authorities in municipalities of more than 500,000 population shall have the power to investigate the enforcement of the municipal ordinances, rules and regulations, and the action, conduct and efficiency of all officers, agents and employees of the municipality. In conducting investigations, the authorities are empowered to hold public hearings, to administer oaths and to issue *subpoenas* to secure the attendance and testimony of witnesses and the production of books and papers relevant to such investigations or to any hearing before such authorities. The act further gives the circuit court or the superior court, upon application of the corporate authorities, power to compel the attendance of witnesses, the production of books and papers and the giving of testimony by attachment for contempt. Appellees successfully contended in the superior court that this statute is unconstitutional and void because it is a special or local law granting a special or exclusive privilege, immunity or franchise, applying only to the city of Chicago, in violation of section 22 of article IV of the constitution of the State of Illinois. That is the principal argument advanced against the constitutionality of the statute here.

Both sides to this appeal have cited extensively decisions of this court in which legislative classification by population has been sustained and denied, but the only conclusion to be drawn is that this court will uphold the classification when it is reasonable and will refuse to give it effect where clearly unreasonable or arbitrary. Each case and each statute must be separately considered and the problem must be resolved by the application of certain time-tested principles to the particular situation. These rules have been stated so often by this court that their reiteration here would appear to be unnecessary. Beginning with the premise that classification is primarily a legislative function with which there should be no judicial interference except to determine whether the legislative action is clearly unreasonable, the

rule is finally deduced that a legislative classification based upon population will be sustained where founded on a rational difference of situation or condition existing in the persons or objects upon which it rests and there is a reasonable basis for the classification in view of the objects and purposes to be accomplished. (*Gaca* v. *City of Chicago,* 411 Ill. 146; *Hansen* v. *Raleigh,* 391 Ill. 536; *People ex rel. Johnson* v. *DeKalb and Great Western Railroad Co.* 256 Ill. 290; *Chicago Terminal Transfer Railroad Co.* v. *Greer,* 223 Ill. 104; *People ex rel. Hatfield* v. *Grover,* 258 Ill. 124; *Douglas* v. *People ex rel. Ruddy,* 225 Ill. 536.) Legislation is not special or local merely because it may operate only in a single place where the condition necessary to its operation exists or because, at the time of its enactment, it can be applied only to one city in the State. (*People* v. *City of Chicago,* 349 Ill. 304; *Mathews* v. *City of Chicago,* 342 Ill. 120; *People ex rel. Carr* v. *Kesner,* 321 Ill. 230.) There is always a presumption that the General Assembly and its committees acted conscientiously and did their duty in making a survey of the conditions prevailing in the municipalities of the State before enacting the classification legislation and the result will never be nullified by this court on the ground that its judgment might differ from that of the General Assembly. Only if it can be said that the classification is clearly unreasonable and palpably arbitrary will the courts act to hold the classifying enactment invalid. (*Gaca* v. *City of Chicago,* 411 Ill. 146.) It must appear that there is no fair reason for the law which would not require with equal force its extension to other cities of smaller population which are not affected before we should be warranted in interfering with legislative judgment. *Hansen* v. *Raleigh,* 391 Ill. 536.

The plain objective of the statute under consideration is to empower the corporate authorities in cities of over 500,000 population to secure information through the investigation of the enforcement of ordinances, rules and

regulations and the investigation of the action, conduct and efficiency of the officers, agents and employees of the municipality. It is said that the object of the statute is law enforcement and that this objective is common to all municipalities since it is presumed that all ordinances passed by every city council should be enforced. But this line of argument, we believe, overlooks the true nature and purpose of the statute which is to enable corporate authorities in the cities affected to obtain information through investigation to help determine the possible need for legislative changes and provide a guide for future legislative action, whether by way of new legislation, amendment or repeal. With this objective in mind, was the legislature unreasonable and arbitrary in limiting the availability of the investigatory and *subpoena* power to corporate authorities in cities of over 500,000 population? Is there a rational difference of situation between aldermen in a city the size of Chicago and those of the smaller municipalities of the State so far as their ability to obtain information is concerned?

Before answering these questions, some facts of which this court takes judicial notice should be stated. The city of Chicago is presently the only city in the State large enough to fall within the challenged classification. In 1950, it had a population of 3,620,952. This population is 32 times as large as that of the city of Peoria, the State's second largest city, which had a population of 111,856 according to the last census. Rockford, with a population of 92,927, ranks third in population. In area the city of Chicago covers 208 square miles as compared to 14 square miles each for Peoria and Rockford. In 1952, Chicago had an average total number of employees of 29,091 of which 7527 were policemen. Comparative figures for Peoria show 740 and 146, and for Rockford 553 and 97. The city council of the city of Chicago is composed of fifty aldermen elected by wards. The populations of the various wards

range from 52,936 to 108,761. Only 14 municipalities of the State have populations from 52,936 to 108,761. From each of these wards an alderman is elected and these 50 elected aldermen constitute the city council and exercise the corporate authority of the city. Ill. Rev. Stat. 1953, chap. 24, par. 1-2(2)(a).

An alderman must necessarily obtain information required in his official position either by personal observation or by reports based upon the observation of others. The difficulty of obtaining reliable information by either method is much greater in a large city like Chicago than in smaller municipalities. The alderman in the smaller municipality, living in close contact with the citizens and officers of his community, many of whom are personally known, has an opportunity to observe for himself their conduct and activities. He can get much of the information needed for the intelligent discharge of his duties at first hand. The alderman in a city such as Chicago must find it practically impossible to secure reliable first-hand information if for no other reason than that most of the people he sees are unknown to him. It may be a physical impossibility for a Chicago alderman to visit and observe even a small portion of the city frequently, yet he is required to act upon problems and pass upon legislation affecting not only the residents of his own ward but over three and a half million people residing in a territory covering 208 square miles. Even where reported information is concerned, the aldermen of small cities have a distinct advantage because of their opportunity to know and evaluate their sources of information to a degree not enjoyed by the members of the city council of Chicago. We must presume that the General Assembly was aware of this situation when it provided the city council of the city of Chicago with an effective means for securing and evaluating that information necessary to a proper performance of its duties. There is a rational difference of situation between

aldermen in the city of Chicago and those of the smaller municipalities so far as their ability and means to secure information is concerned.

With this difference of situation in mind, is the classification of the statute arbitrary and unreasonable in view of the fact that its object is to facilitate the securing of necessary information? We believe not. This court has frequently held that differences in the size of municipalities may raise special or unique problems in connection with many activities which justify classification including indemnification of policemen, (*Gaca* v. *City of Chicago,* 411 Ill. 146;) minimum wages for policemen and firemen, (*Littell* v. *City of Peoria,* 374 Ill. 344; *People ex rel. Moshier* v. *City of Springfield,* 370 Ill. 541;) local transportation, (*People* v. *City of Chicago,* 349 Ill. 304;) bond issues in anticipation of taxes, (*Mathews* v. *City of Chicago,* 342 Ill. 120;) special assessment tax administration, (*People* v. *Kesner,* 321 Ill. 230;) banking, (*People* v. *Adams State Bank,* 272 Ill. 277;) civil-service pension funds, (*Hughes* v. *Traeger,* 264 Ill. 612;) financial requirements, (*People* v. *DeKalb and Great Western Railroad Co.* 256 Ill. 290;) plumbing, (*Douglas* v. *People,* 225 Ill. 536;) administration of justice, (*Chicago Terminal Transfer Railroad Co.* v. *Greer,* 223 Ill. 104; *People ex rel. Henderson* v. *Onahan,* 170 Ill. 449.) Reasons as compelling as those in the cases cited support the classification under the present statute. The very size of a city like Chicago produces that kind of crime which is difficult to uncover in determining whether legislation is needed and whether the various departments are functioning honestly and efficiently. This court recognized the peculiar situation of Chicago with reference to crime in *Gaca* v. *City of Chicago,* 411 Ill. 146, 154, 155: "Preliminary to the passage of the present legislation it must be presumed that some committee of the legislature made a conscientious study and survey of conditions in Chicago to find out if this

legislation was warranted. This investigation would doubtless reveal congestion in travel, both pedestrian and vehicular, causing an uncommon number of automobile accidents; blight and slum areas; areas of unassimilated foreign elements where crimes are bred and protection is offered fleeing criminals; skid rows where poverty, crime and general disrespect for law abounds; narcotic rings, hoodlums, gangsters, and racketeers that kill with sawed-off shotguns, all of which pose problems on Chicago that are not found in other parts of Illinois." We cannot say that the General Assembly, presumably aware of the situation with regard to organized crime in the city of Chicago, acted unreasonably in affording the corporate authorities there a special means, by investigation and *subpoena,* of securing information to determine whether and how the situation could be met by legislation or otherwise. In view of the rational difference in situation and the objects of the statute, we cannot say that the classification is unreasonable or that there is no fair reason for not extending the particular facilities provided by the act to the much smaller cities of the State.

Though appellees did not raise the question in the superior court, the trial judge decided that the act in question here was "destroyed and voided" by the passage of a later act at the same session of the legislature which was given the same section number. It appears that the statute under consideration was introduced as House Bill No. 695. (Laws of 1951, p. 927.) It was entitled "An Act to Amend Section 23-1 of the 'Revised Cities and Villages Act,' approved August 15, 1941, as amended, and to add Section 23-111 thereto." By its terms it provided that section 23-1 be amended to provide that corporate authorities have the powers enumerated in sections 23-2 to 23-111, inclusive. It further provided for the investigative powers in cities of over 500,000 population by adding section 23-111. The act was passed on June 13, 1951,

and approved on July 2, 1951. At the same session of the General Assembly a statute giving municipal authorities the power to enact a municipal retailers' occupation tax was introduced as Senate Bill No. 731. (Laws of 1951, p. 2017.) This bill was entitled "An Act to amend Sections 23-1 and 23-106 of the 'Revised Cities and Villages Act,' approved August 15, 1941, as amended, to add Section 23-111 thereto and repeal Section 23-54.1 thereof." By its terms it amended section 23-1 to provide that corporate authorities should have the powers enumerated in sections 23-2 to 23-111, inclusive. It added section 23-111 providing for the municipal retailers' occupation tax. It repealed section 23-54.1 which was a 1947 act relating to a municipal sales tax. Senate Bill No. 731 was passed on June 30, 1951, and approved on August 3, 1951. The trial court concluded that since at the same legislative session two acts were adopted each amending the Revised Cities and Villages Act by adding section 23-111, and since the subject matter of the bills was foreign to each other and entirely unrelated so that they could not be reconciled, Senate Bill No. 731 had voided House Bill No. 695 because passed and approved at later dates. The effect of the decision of the trial judge is to hold that the act passed later at the same session repealed the earlier act by implication because it carried the same section number.

Repeals by implication are never favored and it is only where there is a clear repugnance between the two acts and the provisions of both cannot be carried into effect that the later law must prevail. The intention of the legislature to repeal must be clear and manifest. For a later statute to operate as a repeal by implication of an earlier one, there must be such manifest and total repugnance that the two cannot stand together. If two statutes are capable of being construed so that both may stand, it is the duty of the court so to construe them. (*People* v. *Holderfield*, 393 Ill. 138, and cases cited.) A careful examination of Senate

Bill No. 731 shows that it is very explicit as to what it is intended to amend, repeal or add. There is certainly no expressed intention to repeal House Bill No. 695. Such an intention is negated by the express provisions in its title. It is the duty of this court to ascertain the intention of the legislature and to give it effect if possible. Here the acts, both additive in nature, deal with entirely different and wholly unrelated subject matter. The decisions of this court relied upon by the trial judge are clearly distinguishable. In each case there was found to be a repeal by implication because two or more acts sought to deal with the same subject matter. Thus, in *People ex rel. Christensen* v. *Board of Education,* 393 Ill. 345, there were two acts which provided different methods, each based upon population ratios, for determining the makeup of the board of education of a school district. In *People ex rel. Hines* v. *Baltimore and Ohio Southwestern Railroad Co.* 366 Ill. 318, each of three amendatory acts purported to amend section 25 of the Counties Act in its entirety and each listed different tax exemptions. It was held that the acts were repugnant as to the subject matter of tax exemptions and and that the latest must prevail. In *People ex rel. Heaton* v. *Illinois Central Railroad Co.* 295 Ill. 408, two amendments to the Roads and Bridges Act set out different maximum tax rates for bonds.

It appears that the present situation arose because of a mistake in section numbering on the part of the legislature. But this court must ascertain the legislative intent and give it effect where possible regardless of mistakes. Where the legislative purpose has been expressed intelligently it will be given effect regardless of technical errors. Thus, in *People ex rel. Barrett* v. *Anderson,* 398 Ill. 480, the Reapportionment Act of 1947 was upheld in spite of the fact that the word "village" had been mistakenly used instead of "township." In *Patton* v. *People ex rel. Sweet,* 229 Ill. 512, an act which mistakenly purported to amend

section 89a of the Farm Drainage Act was held an attempt to amend section 15a of the act, so that a subsequent repeal of section 89a must be regarded as a repeal of section 15a. In *Otis* v. *People ex rel. Raymond,* 196 Ill. 542, it was held that the constitution does not require that the number of the section of the act to be amended be specified and an act purporting to amend section 202 of article VIII of the School Law of 1899 was held valid, though the number 202 was inadvertently used for the number 1, there being no section 202 of the previous act. In *Illinois Central Railroad Co.* v. *People,* 143 Ill. 434, a mistake in reference to number in the title of an amendatory act was held insufficient to defeat the legislative intent and purpose. A consideration of 1951 Senate Bill No. 731 and House Bill No. 695 clearly indicates that the legislature intended both acts to be operative, though mistakenly given the same section number. They deal with entirely unrelated subject matter and the legislative intent can be given effect because there is no repugnance or conflict in their provisions. The trial court was in error in holding that 1951 House Bill No. 695 providing for municipal investigations had been rendered void and of no effect by the passage of the later act.

The ordinance of February 14 1952, creating the emergency committee on crime of the city council of the city of Chicago, contains a preamble reciting that the city council must determine a course of action to drive the hoodlum element out of Chicago and investigate the alliance between crime and politics in the city. The preamble further states, after referring to an ever-mounting number of unsolved gangland-style political murders and assaults which have undermined the confidence of the people in their law-enforcement agencies, that it is desirable that a committee be appointed to investigate the alliance between crime and politics, to determine a course of action to drive the hoodlum element out of Chicago and to recommend such im-

provements as it deems necessary to restore the confidence of the people of Chicago in the Chicago police department and the administration of justice. The enacting clauses of the ordinance are five in number. By section 1 the council is authorized to appoint an emergency committee on crime to consist of nine members of the council to investigate the alliance between crime and politics in the city, to determine a course of action to drive the hoodlum element out of the city and to recommend such improvements as it deems necessary to restore the confidence of the people of Chicago in the Chicago police department and the administration of justice. Section 2 provides for the employment of legal counsel, the holding of public hearings and the issuance of *subpoenas.* Section 3 provides that the committee shall file its interim report with recommendations on or before twenty days from date of the passage of the ordinance. Section 4 provides for the payment of expenses and section 5 relates to effective date. The principal attack on the validity of the ordinance is based upon the contention that there is no express or implied authority in the statute (Ill. Rev. Stat. 1953, chap. 24, par. 23-111,) to enable the municipal authorities to do what is proposed to be done under the provisions of the ordinance, and that if such activity as that proposed in the ordinance is carried out, certain constitutional provisions including section 11 of article II and article VI of the Illinois constitution will be violated.

Before considering these propositions specifically it should be observed that the only investigation by the committee thus far as disclosed by the pleadings in this case involves an investigation of the Chicago police department and some of its officers. The validity and application of a questioned ordinance must be tested on the facts of the case and not upon conjecture. (*Chicago Cosmetic Co.* v. *City of Chicago,* 374 Ill. 384; *Roe* v. *City of Jacksonville,* 319 Ill. 215; *Webber* v. *City of Chicago,* 148 Ill. 313.)

One who would attack a statute or ordinance as unconstitutional must bring himself within the class as to whom the law is unconstitutional. (*City of Elmhurst* v. *Buettgen,* 394 Ill. 248.) The courts will not entertain an objection to the constitutionality of a statute made by a party not in any way aggrieved thereby unless the unconstitutional feature, if it exists, is of such character as to render the entire act void. *People* v. *Day,* 313 Ill. 531.

It is said that there is nothing in the statute authorizing an investigation of the alliance between crime and politics in the city of Chicago; that since there is no such authority in the statute the ordinance exceeds the powers conferred and is invalid. It is true that the only investigation specifically authorized by the enacting clauses of the ordinance is the alliance between crime and politics. The remainder of section 1 relates to determinations and recommendations to be expected from the investigation. But an investigation of the alliance between crime and politics necessarily involves an investigation of municipal ordinances and State laws relating to crime and the action, conduct and efficiency of the officers and employees responsible for enforcement. This is true because an alliance between crime and politics can have only one purpose, the trading of political protection of crime for money or political support. If the alliance is to be effective the participants must work through the officers and employees of the city with inadequate enforcement of all laws, both State and municipal, the result. The very fact that the emergency committee on crime began its inquiries by investigating the Chicago police department is a good indication that that was the first place to look in considering a possible alliance between crime and politics in Chicago. There can be no doubt that had the ordinance specifically authorized an investigation of the police department and its officers it would have been within the powers granted by the statute, *i.e.* "to investigate * * *

the action, conduct and efficiency of all officers, agents and employees of the municipality." But the statute also authorizes the corporate authorities "to investigate the enforcement of the municipal ordinances, rules and regulations, * * *." Any alliance between crime and politics must necessarily have an adverse effect on enforcement, as already indicated. In providing for the investigation of such an alliance the city council stated in effect that it was authorizing an investigation of the enforcement of the municipal ordinances, rules and regulations. The appellees have contended in this connection that the subject of crime and politics is purely a concern of the State government since the definition of crimes and the provision for their punishment is matter for State legislative action. This argument overlooks the fact that the statute involved relates to all municipal ordinances without exception, some of which implement the statutes which make it the duty of Chicago police to enforce State laws. (Ill. Rev. Stat. 1953, chap. 38, par. 655; Ill. Rev. Stat. 1953, chap. 24, par. 9-93.) See: Municipal Code of Chicago, secs. 11-5, 11-24 and 11-25, making it the duty of police officers to enforce State laws and make arrests in connection with crimes. There is only one way to tell how well these particular ordinances are enforced and that is to determine how well the police of Chicago enforce the State criminal laws. While the city authorities have no power to prescribe the incidents or elements of crime or provide for its punishment, an alliance between crime and politics, affecting as it might the enforcement of municipal ordinances and the conduct of municipal employees, is matter of municipal concern and subject to municipal investigation. While the language of the ordinance in our opinion could have been more apt, that is nothing against its validity and we are of the opinion that the investigation authorized is within the power and authority conferred by the statute.

It is further contended that section 23-111 grants no express or implied authority that would authorize the city council to conduct an investigation for the purpose of determining a course of action to drive the hoodlum element out of Chicago; that if such authority is in fact granted, any course of action determined as a result of such investigation which would have the effect of driving out the hoodlum element would be violative of section 11 of article II of the constitution of the State of Illinois which prohibits banishment from the State as punishment. The answer to this line of argument is that the ordinance, fairly considered, authorizes an investigation of the enforcement of the laws and the law-enforcement agencies of the city. There is nothing in this case, as made by the pleadings, about banishing or deporting hoodlums. The argument raises a hypothetical case and a false issue. It may be that as a result of the authorized investigation a course of action will be recommended by legislation or otherwise which will improve the efficiency of the police department, resulting in improved law enforcement which in turn will have the effect of discouraging the hoodlum element from remaining in the city. Such a result, if it should come to pass, would be not only desirable but strictly legal in its accomplishment. The ordinance charges no one with the task of banishing a hoodlum element. It looks, through investigation, to recommendations for improved law enforcement which it is hoped will have the effect desired so far as the hoodlum element is concerned. All ordinances as well as statutes must be given sensible interpretation by the courts. The rules for the construction of municipal ordinances are the same as those applied in the construction of statutes. Strict construction of a statute means only that it must be confined to such subjects or applications as are obviously within its terms and purposes. It does not require such an unreasonably technical construction that the words used cannot be given their fair

and sensible meaning in accord with the obvious legislative intent. (*City of Elmhurst* v. *Buettgen,* 394 Ill. 248.) Sensibly construed and interpreted the ordinance does not authorize the city of Chicago to embark on a program of passing legislation to ban anyone from its limits.

It is also suggested that the statute gives no authority express or implied which would authorize the city council to conduct an investigation for the purpose of recommending such improvements that the committee deems necessary to restore the confidence of the people in the police department and in the administration of justice; that if such a course is authorized and undertaken the result will be an invasion of the powers reserved to the courts of the State including the municipal court of the city of Chicago. Again the effect of this argument is to urge upon this court a strained construction of the ordinance which would render it unconstitutional. There is nothing in the ordinance which indicates an intention to usurp judicial functions. The provision that the committee shall recommend such improvements that it deems necessary to restore the confidence of the people in the police department and in the administration of justice does not mean that it is contemplated that the council will seek to pass legislation regulating the courts or that it will investigate the courts themselves. A consideration of the ordinance as a whole, including its preamble, indicates that the council intended an investigation only of those officers and employees of the city with respect to whom it had some legislative responsibility, particularly the members of the police force, who are part of the legal machinery for the administration of justice. If an ordinance is susceptible of two constructions, one of which will sustain the ordinance and the other defeat it, the courts will adopt the construction sustaining the ordinance. (*Douglas* v. *Village of Melrose Park,* 389 Ill. 98; *City of Chicago* v. *Green Mill Gardens,* 305 Ill. 87.) Since a sensible and reasonable construction of the

ordinance in question avoiding a conclusion of usurpation of judicial functions is possible, that construction will be adopted. There is nothing in the pleadings in this case showing any effort to interfere with or usurp the powers of the judiciary. Nor is there any merit in the contention that the ordinance purports to delegate to the emergency committee on crime the functions of the grand jury, prosecutor and jury. The committee can neither indict, try, acquit, nor convict. It has no power to impose any penalty. The committee has the sole power and function of recommending municipal legislation as the result of its investigation. The fact that information secured by the committee might also be of interest and use to a prosecutor or grand jury is no argument against the validity of the ordinance. (*Sinclair* v. *United States,* 279 U.S. 263, 295.) We cannot arbitrarily read into this ordinance provisions relating to returning indictments, prosecuting criminals or trying them for crimes. Such provisions are not even suggested by any fair or reasonable interpretation of its provisions.

It is contended that the investigation authorized by the ordinance is not a valid legislative function of the city council and that it can have no legislative purpose; that a legislative inquiry can be conducted only upon matters on which the legislature is empowered to legislate. The power and authority of legislative bodies to conduct investigations through committees has been recognized by the courts and is now well established. (*Greenfield* v. *Russel,* 292 Ill. 392; *Sinclair* v. *United States,* 279 U.S. 263; *McGrain* v. *Daugherty,* 273 U.S. 135.) The power of a legislative body to make proper investigations is founded upon necessity. The very existence of a legislative body implies the power to investigate *via* committees of its members into those affairs with respect to which it may legislate or appropriate funds. The alternative is to suppose that legislation for the appropriation of funds, the levying of taxes and their collection, the creation of ad-

ministrative and executive offices, and the enactment of regulations to protect the lives and property of the people must all be enacted without previous investigation. Provisions for the exercise of investigative powers by the General Assembly of this State and its committees have been on the statute books for over eighty years. (Ill. Rev. Stat. 1953, chap. 63, pars. 4, 6, 7, 8, 9 and 10.) In *Greenfield* v. *Russel, 292* Ill. 392, at 400, it was said: "It must also be conceded that a State legislature has power to obtain information upon any subject upon which it has power to legislate, with a view to its enlightenment and guidance. This is essential to the performance of its legislative functions, and it has long been exercised without question." That the power to investigate is an essential and appropriate auxiliary to the legislative function was also recognized by the Supreme Court of the United States in *McGrain* v. *Daugherty, 273* U.S. 135 at 176, where, after extensively reviewing decisions of the State courts upon this question, it was said: "We are of the opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function. It was so regarded and employed in American legislatures before the Constitution was framed and ratified. Both houses of Congress took this view of it early in their history— * * *." Thus the fundamental power granted by the General Assembly of this State to the municipalities affected by section 23-111 of the Revised Cities and Villages Act is soundly based in the common law of this and other jurisdictions.

But there are limitations on the legislative power of investigation and this brings us to the crux of appellees' objection which is not that the city council of the city of Chicago is entirely lacking in the power to investigate but rather that under the particular ordinance in question a true legislative purpose is lacking, especially as indicated by the circumstances disclosed by the pleadings in this case.

The basis for the legislative power to investigate lies in the necessity of the legislature obtaining adequate information in order to legislate. Since this is the basis of the power, the investigation must be for a legislative purpose. (*Greenfield* v. *Russel*, 292 Ill. 392; *Sinclair* v. *United States*, 279 U.S. 263; *McGrain* v. *Daugherty*, 273 U.S. 135.) If such purpose, either express or fairly inferable, is lacking, the investigation will not be sustained. (*Greenfield* v. *Russel*, 292 Ill. 392.) Thus, the first limitation on a legislative investigation is that it must be for a legislative purpose. The second limitation to be hereafter discussed in greater detail, is the requirement that the information sought be relevant or pertinent to the inquiry made. If the inquiry be pertinent, an answer may be required; if it be impertinent or irrelevant the witness may refuse to testify. *Sinclair* v. *United States*, 279 U.S. 263.

A consideration of all the provisions of the ordinance of February 14, 1952, indicates a valid legislative purpose. By the express provisions of the ordinance the committee is to recommend improvements. It fairly appears from the ordinance and its preamble considered as a whole that the city council was concerned about the general inadequacy of law enforcement; that it wanted an investigation made of the situation to determine to what extent it had been affected by council action or inaction and that it wanted recommendations from the committee as to what steps, if any, could be taken by the council to improve the situation. At least so far as the ordinance itself is concerned it looks to possible legislative action and has a proper legislative purpose. There are many types of legislative action which the council might wish to take as a result of the investigation, such as changes in the city ordinances relating to gambling, disorderly houses, taverns and night clubs to make such ordinances more enforceable. Changes in the structure, organization and personnel qualifications of the police department might be indicated as well as improved

pay, improved working conditions and better training for its members. Counsel for appellees rely on the case of *Greenfield* v. *Russel,* 292 Ill. 392, to support their contention that the ordinance and investigation here considered lack legislative purpose. A review of that decision shows that the General Assembly had passed a resolution authorizing an investigation of Wilbur Glenn Voliva and the Christian Catholic Apostolic Church of Zion. The resolution set forth the alleged false and fraudulent character of Voliva and his controlled church. This court held that the resolution authorized a judicial investigation of past conduct and had no bearing on future legislation. In the present situation the investigation is of an entirely different character. It is not an investigation of the defendant Gibbons or of any other individual. Though, as shown by the pleadings, the controversy arose when Gibbons alone was testifying, other witnesses had testified as to prevailing conditions in the involved police district. Such an investigation must necessarily proceed in an orderly fashion and only one witness can be heard at a time. But this does not characterize the inquiry as an investigation of Gibbons or negate its true legislative purpose. While it may be true that a legislature may not investigate appellee Gibbons simply to investigate him, it is not true that the city council of the city of Chicago may not investigate the police department of that city which is an arm of the city government over which it is given the authority of regulation by State law and for which it makes an appropriation of over $27,000,000 annually. The situation presented here is to be contrasted with that found in *Greenfield* v. *Russel,* 292 Ill. 392, where it was said, at pages 397 and 398: "We are convinced from a consideration of this resolution that it was not passed by the General Assembly with a view to have this committee investigate said charges and for the purpose of future legislation if the same should be deemed advisable. This resolution does not anywhere in

it contain language that expresses such a purpose or intention. The purposes sought to be accomplished by the investigation are not disclosed by the resolution. It is the past conduct of a private party and a private institution that is to be investigated, and the committee is to investigate all the affairs of said institution and of said party. It appears that the private party to be investigated is not a public officer of any character in this State and that the institution to be investigated is not a municipality or corporation organized under the State law." The present investigation is not of a private party, it is an investigation by a committee of the city council of the city of Chicago of the police department and its members. Appellee Gibbons is, or was, a captain in that department. Because of its power to create and regulate such a department and to make appropriations therefor the city council has a very direct interest in the department and the conduct of its members.

This brings us to the final question whether the information sought from Captain Gibbons was pertinent and in aid of the legislative purpose. The question asked and the answer given have been heretofore set forth in full. The complaint further alleges and it is admitted by the motion that Gibbons further refused to answer the question in a private or executive session of the committee. The refusal to answer was not based upon any constitutional right or claim of constitutional privilege but only on a claimed right of privacy. This raises the precise question whether a witness legally summoned to testify before a properly constituted body can refuse to testify on the ground that the testimony relates to matters which he chooses to regard as private so long as the information sought is pertinent. We believe there can be no doubt as to the pertinency of the question and the information sought to the purpose and scope of the inquiry. It must be recalled that the complaint alleges that the investigation

had developed that there were open and notorious violations of the laws relative to gambling, prostitution and taverns in the district commanded by Gibbons; that the testimony had indicated that the captain was controlled by persons controlling these illegal activities; that law enforcement was lax; that Gibbons had denied that he knew these persons and that he had denied receiving anything from any of them. These facts are admitted by the motion. As alleged in the complaint, the committee was at the time investigating the Chicago police department and particularly its Thirty-sixth police district. As previously indicated, the purpose of the investigation was to obtain information which should serve as a guide to improve conditions found to exist. Was it not pertinent for the committee to determine at this juncture, for example, the answer to such questions as whether a police captain could live within his income; whether a captain might accept gifts; whether he might be able to save money or whether he might have outside jobs or income from other sources? All such lines of inquiry might produce information having a direct bearing on suggested ways and means to improve the efficiency and honesty of the department and its members. Such lines of inquiry would be pertinent to the legislative purpose of securing information necessary to serve as a basis for legislation making improvements. The particular question asked was pertinent to this purpose. Surely, the body charged with the responsibility of future regulation of the police department is entitled to know whether the members of that department have outside income. For example, if an officer is found to be devoting so much of his time to outside work for the sake of additional income that he cannot properly attend to the duties of his office, that is of concern to the committee and pertinent to the investigation, if for no other reason than that legislation providing for better pay might be indicated. Nor is it of any consequence that certain an-

swers Captain Gibbons might give could possibly be irrelevant so long as the questions themselves are relevant and so long as other possible answers might contain information pertinent to the committee's investigation.

But what of the claim of privacy? Careful consideration of the cases in which this question has arisen leads to the conclusion that in the absence of a claim of privilege against self incrimination there is no "right of privacy" which permits a witness to refuse to answer a relevant question put by a legally constituted body before which he is properly summoned. Only if the question is irrelevant can he refuse to testify on the ground that his privacy has been invaded. In the case of *Sinclair* v. *United States*, 279 U.S. 263, Harry Sinclair was called before an investigating committee of the United States Senate which was investigating certain land transactions relating to the Teapot Dome. He was asked to tell about a contract he had made with one Bonfils relating to the lands in question. Sinclair declined to answer, claiming that the question related to his private affairs. He specifically declined to claim the privilege against self incrimination, stating in a prepared statement that there was nothing in the transaction which could incriminate him. The Supreme Court of the United States upheld his conviction under a statute imposing a criminal penalty for failure to answer. In a lengthy opinion, in which many of the cases cited by both sides in this appeal are discussed, the court, referring to *McGrain* v. *Daugherty*, 273 U.S. 135, states the limits of the right of the witness to privacy and the right of the legislature to information, at pages 291 and 292: "And that case shows that, while the power of inquiry is essential and an appropriate auxiliary to the legislative function, it must be exerted with due regard for the rights of witnesses, and that a witness rightfully may refuse to answer where the bounds of the power are exceeded or where the questions are not pertinent to the matter under inquiry."

Counsel for appellees appear to take the position that it can never be proper in a legislative inquiry to ask a witness about his private affairs, or affairs he may consider private. Wigmore, in his work on Evidence, in discussing this question of a claim of privacy as against the right of the public to evidence, emphasizes that the public has a right to every man's evidence and that all privileges of exemption from this duty to give evidence are exceptional and each claim of privilege must be carefully examined to determine whether it is justified. (8 Wigmore, Evidence, 3d ed., 1940, sec. 2192.) He states: "The sacrifice may be of his privacy, the knowledge which he would preferably keep to himself because of the disagreeable consequence of disclosure. This inconvenience which he may suffer in consequence of his testimony, by way of enmity or disgrace or ridicule or other disfavoring action of fellow-members of the community is a contribution which he makes in payment of his dues to society in its function of executing justice. * * * When the cause of justice requires investigation of the truth, no man has any knowledge that is rightly private." (8 Wigmore, Evidence, 3d ed. 1940, sec. 2192, p. 66.) In the recent case of *United States* v. *Orman*, 207 Fed. 2d 148, (1953), the United States Circuit Court of Appeals for the Third Circuit affirmed a conviction for contempt of the Senate Committee to Investigate Organized Crime in Interstate Commerce. Orman had been subpoenaed to appear as a witness before the committee. He appeared but refused to give certain information as to his income and financial affairs on the ground that these matters referred to his personal affairs and that he did not want them made public. In its opinion the court first discusses the rule of relevancy and finds that the information sought was pertinent to the inquiry being conducted. The court then considers the claim of privacy and, after reviewing the cases, concludes (at page 158): "The individual must rely, for the protection of his pri-

vacy, upon the requirements of pertinency discussed above." This decision again emphasizes the rule that a witness before a congressional committee must rely, for protection against undue invasion of his privacy, upon the requirement that the question be pertinent to the matter under inquiry by the committee, and if the question is pertinent to the general subject of the matter under investigation, refusal to answer cannot ordinarily be justified on the ground that it is an invasion of privacy. A further interesting aspect of the *Orman case* is that the witness at one point attempted to condition the possible giving of the information sought on the committee's agreement not to give it to the newspapers. In the case before us it will be recalled that Captain Gibbons offered to talk to the committee counsel in private but refused to give the information to the committee either in public or private session.

The above authorities apply the principle of relevancy to a claimed right of privacy in situations in which a private individual was summoned to testify. It applies with even greater force to the situation here presented where inquiry is made of a police captain by a committee of the very body charged with the responsibility of the creation of a police department, the appropriation of funds to operate it and the regulation of its affairs. The complaint in the case of Du Bois v. Gibbons shows a right in the committee to require an answer of the witness. The superior court was in error in sustaining the motion to dismiss.

As to the case of Du Bois v. Gibbons the judgment of the superior court is reversed and the cause is remanded with directions to overrule defendant's motion. As to the case of Carlson v. City of Chicago *et al.,* the decree of the superior court of Cook County is reversed and the cause is remanded with directions to dissolve the injunction and dismiss the complaint.

*Reversed and remanded, with directions.*