**UNITED STATES of America ex rel. Larry HOOVER, et al., Petitioners,**

v.

**Robert ELSEA, et al., Respondents.**

No. 79 C 790.

United States District Court,
N.D. Illinois, E.D.

Jan. 27, 1983.

Jonathan C. Moore, Chicago, Ill., for petitioners.

Patricia J. Bornor, Sp. Asst. Atty. Gen., Chicago, Ill., for Illinois respondents.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This habeas corpus petition is on remand from the Court of Appeals. *United States ex rel. Hoover v. Franzen,* 669 F.2d 433 (7th Cir.1982), *vacating and remanding United States ex rel. Hoover v. Elsea,* 501 F.Supp. 83 (N.D.Ill.1980). Presently before me is the motion of petitioner Randy Dillard for

an order transferring him to state custody pending final resolution of this litigation. For the reasons stated below, I deny Dillard's motion.

The ten petitioners are prisoners of the Illinois Department of Corrections, pursuant to convictions in the Circuit Court of Cook County. At the time they brought this action petitioners were in the custody of the warden of the federal Metropolitan Correctional Center in Chicago. They had been transferred there from Stateville Prison, an Illinois facility, in anticipation of further transfer to various federal prisons in Illinois and in other states. On March 1, 1979, petitioners filed a petition for a writ of habeas corpus, naming the warden of the Metropolitan Correctional Center as respondent. That same day a stay of transfer to other federal prisons was issued by Judge John Powers Crowley of this court.[1] On March 15 petitioners filed their "Supplemental Petition for a Writ of Habeas Corpus," adding a claim and naming as additional respondents the Director of the Illinois Department of Corrections and the warden of Stateville Prison.

The Supplemental Petition contained three claims. Claim I alleged that petitioners' transfer to federal custody was in violation of 18 U.S.C. §§ 4001(a) and 5003, and of the Fifth and Fourteenth Amendments to the United States Constitution. 18 U.S.C. § 5003 authorizes the federal government to receive state prisoners pursuant to contract with state officials.[2] *Lono v. Fenton*, 581 F.2d 645 (7th Cir.1978), held that § 5003 conditions such transfers upon the transferee's having a specialized need that cannot be accommodated by the state prison system; the prisoner's expectation that a transfer will occur only when this condition is fulfilled entitles him to notice and a hearing satisfying the constitutional requirements of due process. Petitioners alleged that they were not given

proper notice and hearing, and that the required specialized need did not exist. (As will be seen, *Lono v. Fenton* no longer is good law.)

Claim II alleges that petitioners were denied due process by the failure to give them notice and an opportunity to be heard before their transfer. Exactly what interest was alleged to give rise to these due process rights is discussed below, but at this point it suffices to state that two sources for a liberty interest were specified: 18 U.S.C. § 5003, and Article I, § 11 of the Illinois Constitution, which states in pertinent part, "No person shall be transported out of the State for an offense committed within the State."

Claim III asserts that petitioners' transfer violates Article I, § 11 of the Illinois Constitution.

Petitioners' transfer to federal custody occurred during a much-publicized operation at Stateville. In newspaper reports submitted by petitioners, state officials characterize petitioners' transfer as a key step in a long-term plan to seize control of the penitentiary back from gangs of inmates. According to the newspaper reports, prison officials found weapons, drugs and other contraband in petitioners' possession. In their petition, petitioners do not allege that their transfer was retaliatory or disciplinary, but they do allege that their transfer "was part of a politically motivated campaign to blame prisoners for the abhorrent conditions in Illinois prisons." (Supplemental Petition, ¶ 12.)

*The District Court*

In a memorandum opinion and order dated September 23, 1980, Judge Crowley granted the petition for a writ of habeas corpus. Judge Crowley first considered whether he could assert pendent jurisdiction over Claim III, a state law claim against the state respondents.[3] He held

---

**1.** Judge Crowley resigned his judgeship while this case was before the Court of Appeals.

**2.** 18 U.S.C. § 4001(a) reads:
No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

**3.** Judge Crowley apparently accepted the federal respondent's contention that Claim III could be asserted only against the state respondents. 501 F.Supp. at 86 n. 4.

that he could, and he also held that it was proper for him to address Claim III first, as it might obviate the need to address the federal questions presented in Claim I and Claim II. On the merits Judge Crowley held that transfer of Illinois prisoners to prisons outside of Illinois violates Art. I, § 11. Judge Crowley then addressed separately the question of Illinois prisoners transferred to federal prisons within Illinois. He followed *Lono v. Fenton* in holding that 18 U.S.C. § 5003 creates an expectation in state prisoners which entitles them to notice and a hearing before transfer. Judge Crowley therefore ordered the federal respondent to return the petitioners to state custody. He enjoined the state respondents from transferring prisoners to prisons out of the state, and he also ordered that no state prisoner be transferred to a federal prison within Illinois except upon a showing of specialized need at a hearing affording the prisoner his due process rights. It should be noted that Judge Crowley impliedly held that Art. I, § 11 does not prohibit transfer of state prisoners to federal prisons within Illinois.

*The Court of Appeals*

The state respondents appealed, and on January 12, 1982 the Court of Appeals filed an opinion and order vacating the District Court's order and remanding the case. Most of the Court's opinion addresses the District Court's exercise of pendent jurisdiction. First, the Court held that the District Court's issuance of a writ of habeas corpus for a violation of state law improperly ignored an important choice of laws question. Even if pendent jurisdiction over a state law claim did exist, it did not follow that the remedy available under the federal claims, i.e., a writ of habeas corpus, was available under the pendent state law claim. Second, in an extended discussion, the Court held that a federal habeas corpus claim under 28 U.S.C. §§ 2241 et seq. is an insufficient federal basis to support pendent jurisdiction over state law claims. The District Court therefore did not have jurisdiction to rule upon Claim III. Turning to the

District Court's ruling on transfers to federal prisons in Illinois, the Court held that Supreme Court decisions subsequent to *Lono v. Fenton* had rejected the holding of that case, and that 18 U.S.C. § 5003 does not require transfers of state prisoners to federal custody to be preceded by notice and a hearing. The Court directed the District Court to dismiss Claim I.

Both bases for the District Court's order thus were rejected by the Court of Appeals, but the Court identified two issues under Claim II remaining to be considered on remand. First, the District Court was directed to consider whether Art. I, § 11 of the Illinois Constitution creates a liberty interest giving rise to federal due process rights. The Court observed that violation of a state constitutional provision, without more, does not result in a violation of federal substantive due process rights. The Court stated: "In order for the violation of state law to rise to the level of a federal constitutional violation, it must be alleged that the violation was the result of arbitrary state action. [Citing cases.] No such claim has been made in this case and therefore no federal claim is presented." 669 F.2d at 445–46 n. 28. The Court also observed that federal procedural due process rights would not be implicated if Art. I, § 11 operates as an unconditional bar on transfers, since an unconditional prohibition accords no procedural rights. *Id.* at 446 n. 29. If Art. I, § 11 allows transfers under certain circumstances, however, then a conditional liberty interest may be created, entitling prospective transferees to notice and a hearing on the issue of whether the requisite circumstances are present. The Court of Appeals therefore directed the District Court to consider on remand whether Art. I, § 11 creates a conditional liberty interest. *Id.* at 446 & n. 29. As a second issue to be considered on remand, the Court observed that it did not decide the question whether Art. I, § 11 has any application to transfers of state prisoners to federal prisons within Illinois. *Id.* at 446 n. 30.

*After Remand*

The mandate of the Court of Appeals issued on February 3, 1982. Shortly thereafter, Dillard presented a motion for a rule to show cause why the state respondents should not be held in contempt, and for an order transferring him to state custody. Dillard's motion stated that the ten petitioners had been transferred back to state custody, but that on the date of the Court of Appeals mandate he had been transferred to the United States Penitentiary at Marion, Illinois.

Dillard's motion and supporting memoranda offered two theories. First, Dillard argued that his transfer to Marion was in contempt of the Court of Appeals mandate. I denied this portion of Dillard's motion on March 3, 1982. Second, Dillard argued the substantive merits of his case, and requested a transfer back to state custody pending final resolution of the litigation. This portion of Dillard's motion, which now is before me, is a request for interlocutory relief in the nature of a preliminary injunction.

The state respondents resist Dillard's motion primarily by attacking the legal sufficiency of his claims. A ruling upon Dillard's motion therefore involves a determination whether he states a claim for relief based on his transfer to Marion, and, if he is held to state a claim, a determination of his entitlement to interlocutory relief. Because I hold that Dillard does not state any cognizable claim based on his transfer to Marion, I need not consider on what basis I could order the interlocutory relief he requests. In considering the legal sufficiency of Dillard's claim I take as true the allegations of the Supplemental Petition, with two types of exceptions. First, I refer to documents outside the pleadings where invited to do so by Dillard. Second, I ignore allegations of transfer to the federal Metropolitan Correctional Center in Chicago and of threatened and imminent transfer to out-of-state federal prisons. This motion for

interlocutory relief has been presented and briefed on the assumption that only Dillard's transfer to Marion is in issue, and on this assumption I rule upon the motion.[4]

*Jurisdiction*

This court has jurisdiction under the mandate of the Court of Appeals dated February 3, 1982. The Court of Appeals held that federal jurisdiction over Claim I and Claim II is based on 28 U.S.C. § 2254(a) and 28 U.S.C. § 2241(c)(3). 669 F.2d at 442 & n. 19. The Court also held that the state-remedy exhaustion requirement of 28 U.S.C. § 2254(b) does not govern this case. 669 F.2d at 445.

*Illinois Constitution, Art. I, § 11*

Under Claim II, the only claim surviving the decision of the Court of Appeals, Dillard argues that his transfer without notice and a hearing violated his right to due process of law. Such a claim requires identification of some liberty or property interest of which the claimant has been deprived without due process. Dillard argues that his transfer to Marion deprived him of a liberty interest in remaining within the state prison system, derived from Art. I, § 11 of the Illinois Constitution. To prevail, Dillard must convince the court that the constitutional provision on which he relies has some application to the transfer of state prisoners to in-state federal prisons. It also must appear that the provision operates as only a conditional prohibition of such transfers; if the provision is an absolute bar to such transfers Dillard does not state a cognizable federal claim, as procedural due process rights attach only to conditional liberty interests. 669 F.2d at 446 n. 29.

Judge Crowley considered the effect of Art. I, § 11 in ruling upon petitioners' Claim III. He held that Art. I, § 11 absolutely prohibits transfer of Illinois prisoners to prisons in other states. He also held impliedly that the provision does not bar transfers of Illinois prisoners to federal prisons within Illinois. 501 F.Supp. at 88.

**4.** Dillard has not argued on this motion that he is threatened with imminent transfer out of state. He does make the argument, analytically distinct, that one factor contributing to the illegality of his transfer to Marion is the ease with which he could be transferred from Marion to a federal prison outside Illinois.

The Court of Appeals held that Claim III was not within the subject matter jurisdiction of the District Court, and it vacated the District Court's judgment. 669 F.2d at 446. The Court did not question Judge Crowley's interpretation of Art. I, § 11, but by vacating the District Court's judgment the Court of Appeals denied his ruling any precedential effect. *County of Los Angeles v. Davis,* 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384–85 n. 6, 59 L.Ed.2d 642 (1979). In any event, I am not persuaded by Judge Crowley's reasoning, and I will undertake my own examination of Art. I, § 11.

Art. I, § 11 of the Illinois Constitution of 1970 reads in full:

All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. No conviction shall work corruption of blood or forfeiture of estate. No person shall be transported out of the State for an offense committed within the State.

The transportation clause has appeared in some form in all of Illinois' constitutions. Art. VIII, § 17 of the 1818 Constitution provided: "That no person shall be liable to be transported out of this state for any offense committed within the same." An identical provision appeared as Art. XIII, § 18 of the 1848 Constitution. Art. II, § 11 of the 1870 Constitution provided:

All penalties shall be proportioned to the nature of the offense, and no conviction shall work corruption of blood or forfeiture of estate; nor shall any person be transported out of the state for any offense committed within the same.

This provision was the basis for Art. I, § 11 of the 1970 Constitution.[5]

At the Constitutional Convention a member of the Bill of Rights Committee commented on the transportation clause:

The third clause, "nor shall any person be transported out of the state for any offense committed within the same," is akin to the second clause, being explanatory once again. It really has no contemporary significance. The historical basis is evidenced in, for instance, the settling of our original colonies where English prisoners were brought over to do the mundane work necessary for settlement. This has been interpreted in very ancient cases as being so particularly cruel that there is no absolutely decisive case law on this section alone.

Approximately one-third of our states now retain this section in their bill of rights. As indicated in our committee report, this section passed with a seven-to-five vote, and I think this is not indicative of the intent to retain this language. The five votes dissenting retention were broken down between proponents of some akin matters—for instance, proponents of inclusion of the federal language of "cruel and unusual punishment." We felt, I believe as a committee, that while we could either include or substitute that language for the existing language, we would be making no substantive changes and, therefore, we preferred not to do it.

---

5. The Constitution of 1818 carried a provision declaring in part "[t]hat no freeman shall be imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." Art. VIII, § 8, Illinois Constitution of 1818. Identical, except for the addition of an immaterial comma, was Art. XIII, § 8, Illinois Constitution of 1848. These provisions seem to suggest that the penalty of exile could be imposed in spite of the transportation clause, so long as the requirements of due process were respected; however, an examination of these clauses counsels against placing much importance on them in construing the transportation clause. The phrase "deprived of his life, liberty or property" is taken, of course, from the Fifth Amendment to the United States Constitution. The remaining language, including the phrase "outlawed or exiled," tracks fairly closely the language of Magna Charta, ch. 39, as supplemented by the earliest amendments to it. *See, e.g.,* 25 Edw. 1, ch. 29 (1297). That these clauses consist almost entirely of stock, formulaic language borrowed from earlier documents suggests that their reference to exile should not affect the construction to be given the transportation clause. The analogous due process clauses of the 1870 and 1970 Constitutions do not mention outlawry or exile. Art. II, § 2, Illinois Constitution of 1870; Art. I, § 2, Illinois Constitution of 1970.

III *Record of Proceedings, Sixth Illinois Constitutional Convention* 1380 (1970) (comments of John Dvorak).

The transportation clause of the 1870 Constitution was construed in *Du Bois v. Gibbons,* 2 Ill.2d 392, 118 N.E.2d 295 (1954). That case involved a challenge to legislation that authorized the City of Chicago to investigate ties between organized crime and city politics, and to determine a course of action "to drive the hoodlum element out of Chicago." *Id.* at 410, 118 N.E.2d 295. The court stated that this portion of the legislation was challenged under "section 11 of article II of the constitution of the State of Illinois which prohibits banishment from the State as punishment." The court rejected the challenge, stating that "[t]here is nothing in this case, as made by the pleadings, about banishing or deporting hoodlums.... The ordinance charges no one with the task of banishing a hoodlum element.... Sensibly construed and interpreted the ordinance does not authorize the city of Chicago to embark on a program of passing legislation to ban anyone from its limits." *Id.* at 410–11, 118 N.E.2d at 305. This appears to be the only construction of the transportation clause by the Illinois courts.

An analysis of the 1870 Constitution, prepared for the Illinois Constitutional Study Commission in 1969, described the transportation clause as a prohibition on "banishment or exile from the realm." G. Braden & R. Cohn, *The Illinois Constitution: An Annotated and Comparative Analysis* 53 (1969). The authors of the report suggested that the Constitutional Convention might wish to eliminate this clause, as the proscribed punishment, if reinstated by the Legislature, probably would be prohibited by the due process clause.

There is no question that the primary objective of the transportation clause is to prohibit penalties such as banishment and exile, but it is the language of the clause, rather than its primary intent as otherwise ascertained, that determines its scope. In this connection it should be noted that "transported," in the context of criminal punishment, is a term of art. To "transport" is "[t]o carry away or convey into banishment, as a criminal or a slave; to deport." XI *Oxford English Dictionary* 276 (1933) ("transport," verb definition 2.c). A "transport" is "[a] transported convict; a person under sentence of transportation. Now *rare*." *Id.* (noun definition 5). *See also* Black's Law Dictionary 1344 (5th ed. 1979) ("transportation"); Webster's Third New International Dictionary 2430 (Unabridged ed. 1976) ("transport," verb definition 3, noun definition 5). There can be no contention that "transported" in Art. I, § 11 carries the general meaning of "conveyed," "carried" or "moved." By its language as well as by its primary intent, the transportation clause does not prohibit all conveyances of convicts across state lines, but instead proscribes a particular type of punishment; the question for the court is whether Dillard's transfer to Marion falls within this proscription.

The state respondents have produced one case considering an argument similar to that raised by petitioners. In *Girouard v. Hogan,* 135 Vt. 448, 378 A.2d 105 (1977), the plaintiff challenged his transfer from a Vermont state prison to a federal prison in New York. The court described the plaintiff's argument and rejected it:

The complaint filed by the plaintiff asserted that the proposed transfer out of the State of Vermont would violate his right of residence guaranteed to him, as he claims, by the Vermont Constitution. As further grounds, and the only grounds advanced in his brief before this Court, he claims such transfer also constitutes the punishment of exile, banishment or transportation (in the English sense of "beyond the seas"). These are penalties to be imposed judicially under appropriate legislative authority, says the plaintiff, and here they are being illegally imposed by the Executive Branch.

 . . . .

The plaintiff's analogizing of the transfer to federal prison with exile, banishment and transportation outruns the realities. The essential ingredient of those

dispositions is lacking. The plaintiff is not forbidden the State of Vermont. The dramatic comparison of a transfer from prison in Windsor to prison in New York City to exile fails because the transfer is not for the purpose of depriving the plaintiff of his right to freely inhabit the State of Vermont. His freedom to do so is forfeit by his sentence of incarceration, wherever served, and would be restored in consequence of any release from confinement. The fact that the confinement may take place outside of the State of Vermont is merely a fortuitous consequence of a properly invoked administrative decision and not a designed denial of the State of Vermont to him imposed as a penalty.

135 Vt. at 449–50, 378 A.2d at 106–07.

The parties have submitted no historical accounts of the nature of transportation, exile and banishment. Such aid to the court would seem to be incumbent especially upon petitioners, who seek relief under an obscure and vestigial constitutional provision. I have not undertaken a thorough analysis of these punishments, but for general background information I have consulted relevant portions of three works: 1 L. Radzinowicz, *A History of English Criminal Law and its Administration from 1750* (1948); G. Ives, *A History of Penal Methods: Criminals, Witches, Lunatics* (1914 & photo. reprint 1970); and Craies, *The Compulsion of Subjects to Leave the Realm,* 6 Law Q.Rev. 388 (1890).

The sentence of transportation replaced the earlier punishments of banishment and abjuration. In the Eighteenth and Nineteenth Centuries transportation generally consisted of involuntary servitude for a term of years, under indenture to a private master in America or, after American independence, in some other colony, usually Australia. Much of the cruelty of transportation seems to have inhered in the masters' relative freedom to mistreat their inden-

tured transports, in addition to the obvious physical and psychological burdens of distant separation from home, family and accustomed society. To some extent these elements are present in any sentence of incarceration, but they could be increased greatly by transfer to a foreign or distant prison. The reasoning of the *Girouard* court has much to commend it, but it may prove too much, possibly leading to the conclusion that incarceration never is banishment, no matter where the prisoner is held. Transfer of Illinois prisoners to facilities in Alaska, for instance, truly might fall within the main thrust of the constitutional prohibition of transportation. If so, incarceration in Indiana also might be prohibited, since the language of the transportation clause, "transported out of the State," does not seem to invite distinction between distant states and neighboring states, or between states with harsh climates and states with milder climates.

On this motion I need resolve only Dillard's claim, and he is not in Alaska, nor is he anywhere outside the boundaries of the State of Illinois. The obvious obstacle to Dillard's case is that he is not outside the state.[6] Dillard attempts to clear this hurdle with several references to the inapplicability of state law on federal enclaves. Illinois law generally is not applicable at Marion, at least of its own force, so Dillard in some sense has been taken out of the jurisdiction of Illinois. He has been transferred out of the regime of Illinois law and into a regime of federal law. Some prison regulations may be different, and Dillard may be deprived of some of the rights and privileges he enjoyed at Stateville.

It is difficult, in 1983, to ascertain the scope of a prohibition of banishment, exile and transportation. I believe, however, that the transportation clause does not protect those convicted of crimes within Illinois from the regime of statutes, regula-

6. Dillard has referred to the possibility of further transfer from Marion to an out-of-state federal prison. He has not argued that such a transfer is imminent, and he has not argued that he will be unable to challenge a future

out-of-state transfer independently, at the time it occurs or becomes imminent. The possibility of future transfers out of state therefore is immaterial to the legality of his transfer to Marion.

tions and rules governing inmates in federal prisons. Dillard has detailed his hardships at Marion—including loss of visitation rights, loss of a part-time job, and loss of access to state legal materials—but he has not demonstrated that the transportation clause protects him from these hardships when encountered within the boundaries of the State of Illinois.[7] The inapplicability of Illinois law on federal enclaves is not irrelevant to the apparent purposes of the transportation clause; denial of the protections of Illinois law may be an important element of transportation. This consideration is not sufficient, however, to justify characterizing transfer to Marion as transportation out of the state, which is what the Illinois Constitution prohibits.

I therefore hold that the transportation clause of Art. I, § 11 of the Illinois Constitution has no application to Dillard's transfer to the federal penitentiary at Marion, Illinois. I do not decide whether the transportation clause applies to transfers to federal or state prisons outside of Illinois, nor do I decide whether any prohibitions embodied in the transportation clause are absolute or conditional.

*Other Sources for a Conditional Liberty Interest*

In his memoranda submitted on this motion Dillard argues that the conditional liberty interest entitling him to notice and a hearing may derive from various Illinois statutes. The state respondents point out that Dillard has raised this argument late in the litigation, and it is doubtful that petitioners originally intended to rely on these statutory sources for their liberty interest. The state respondents have responded to Dillard's new arguments, and, after considering the statutes cited by Dillard, I rule that the statutes do not create a conditional liberty interest in remaining incarcerated in Illinois state prisons.

Dillard cites three provisions. Ill.Rev. Stat. ch. 38, § 1005–8–5 provides in part:

Upon rendition of judgment after pronouncement of sentence of periodic imprisonment, imprisonment, or death, the court shall commit the offender to the custody of the sheriff or to the Department of Corrections. A sheriff in executing a mittimus issuing upon a commitment to the Department of Corrections shall convey such offender to the nearest receiving station designated by the Department of Corrections. The court may commit the offender to the custody of the Attorney General of the United States . . . when a sentence for a State offense provides that such sentence is to run concurrently with a previous and unexpired federal sentence.

Ill.Rev.Stat. ch. 38, § 1005–8–6 provides in part: "Offenders sentenced to a term of imprisonment for a felony shall be committed to the penitentiary system of the Department of Corrections." Section 1005–8–6 also refers to commitment to the Attorney General of the United States in the event of concurrent state and federal sentences. Ill.Rev.Stat. ch. 38, § 1003–4–4 is comprised of the Interstate Corrections Compact. Article IV(a) of the Compact provides:

Whenever the duly constituted authorities in a state party to this compact, and which has entered into a contract pursuant to Article III, shall decide that confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment, such official may direct that the confinement be within an institution within the territory of such other party state, the receiving state to act in that regard solely as agent for the sending state.

The United States is a "state," as that term is defined in the Compact. Art. II(a). ▮ Addressing the Interstate Corrections Compact, Dillard focuses on the word

---

**7.** It is immaterial to the questions before the court whether, as Dillard asserts, his subjection to these hardships works a violation of Art.

IV(e) of the Interstate Corrections Compact, Ill.Rev.Stat. ch. 38, § 1003–4–4.

"necessary" in the passage quoted above. Also included in the statute, of course, is the word "desirable." The minimum requirement is that state authorities deem a transfer "desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment." This requirement does not limit the discretion of state officials sufficiently to create a conditional liberty interest entitling prospective transferees to a hearing. In *Howe v. Smith,* 452 U.S. 473, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981), the Supreme Court considered 18 U.S.C. § 5003, which authorizes federal officials to accept state prisoners, and held that the statute does not limit federal officials' discretion sufficiently to create a conditional liberty interest in prisoners.[8] Arguably, the language of the Interstate Corrections Compact structures transfer decisions to a somewhat greater degree than does 18 U.S.C. § 5003, but any difference that might exist would be too slight to distinguish the two statutes.

In view of the Compact, a fairly detailed provision of Illinois law which, I hold, does not condition transfer on any particular showing by state authorities, the other statutory provisions relied on by Dillard cannot create the conditional liberty interest he seeks to establish. These sections might suggest, when read alone, that confinement must be in the Illinois prison system, but these sections should not be read alone. The Interstate Corrections Compact explicitly authorizes transfer of prisoners to federal prisons or to the prisons of other states, and this authority is not limited or conditioned by the implied suggestions of other sections.

Dillard also seeks to establish his conditional liberty interest by characterizing his transfer as disciplinary. This argument too is raised late in the litigation, and it is made only casually. Dillard's general reliance on "the history of this case" (Dillard memo of March 2 at p. 5) is unavailing. Dillard also invites the court to rely on affidavits submitted by the State respondents supporting their decision to transfer the petitioners. (Dillard memo of April 9 at p. 7.) While these affidavits do refer to misconduct by the petitioners, the affiants' approach is predictive rather than disciplinary. *See Shango v. Jurich,* 681 F.2d 1091, 1103 n. 20 (7th Cir.1982). Even a transfer for disciplinary reasons would not require a hearing, however, since the authorities' discretion to order a transfer is not limited. *Id.* at 1098–99 n. 14.[9] Finally, it should be observed that the state respondents' efforts to justify petitioners' transfer were attempts to comply with *Lono v. Fenton,* which since has been overruled. 669 F.2d at 445. Especially under such circumstances it would be improper to infer, from the State respondents' attempt to justify the transfers, that they really are required to provide a justification. *See* 681 F.2d at 1102–03.

*Equal Protection*

In addition to exploring possible sources for a conditional liberty interest, Dillard also makes an equal protection argument. The basis of this argument is Illinois Department of Corrections Administrative Regulation 819 ("A.R. 819"), which establishes a procedure, including a hearing, to be followed when a prison resident requests a transfer or when a member of the institutional staff recommends transfer of a prisoner. Dillard's argument is that A.R. 819 entitles prisoners to a hearing before transfer to another state facility; failure to afford a hearing before transferring prisoners to federal facilities denies such prisoners equal protection of the laws. Directed to

---

**8.** 18 U.S.C. § 5003(a) provides:

The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory:

*Provided,* That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

**9.** In footnote 14 of *Shango v. Jurich* the Court of Appeals rejects its own earlier statements and suggestions to the effect that a disciplinary transfer must be preceded by a hearing. No Circuit Judge favored a rehearing *en banc* on this issue. 681 F.2d at 1091 n.

respond to this argument, the state respondents produced *Shango v. Jurich, supra,* which holds that A.R. 819 does not limit state officials' discretion to transfer a prisoner and that the regulation therefore does not create a conditional liberty interest. The state respondents comment on Dillard's tardiness in raising this argument, and also assert that in spite of A.R. 819, prisoners are not given hearings before being transferred between state facilities.

*Shango v. Jurich* is not dispositive. In that case the Court of Appeals held that A.R. 819, while requiring a hearing, does not limit officials' discretion to order transfers. The right to a hearing under state law does not signal conclusively that state officials' discretion is limited, and it therefore is insufficient to give rise to a conditional liberty interest and a federal right to a hearing. 681 F.2d at 1100–01. This does not mean that the state cannot fall afoul of the equal protection clause by conferring a state-law right to a hearing on an illegally discriminatory basis.

■ Adequate reason exists, however, for rejecting Dillard's equal protection argument: the Supplemental Petition does not make the allegations necessary to state a claim. There is no allegation that any prisoner ever was afforded a hearing before his

transfer, and a charge of illegal discrimination between transferees to Illinois prisons and transferees to other prisons simply cannot be made out from the allegations. On this basis I reject Dillard's equal protection argument.[10]

Other weaknesses appear in the equal protection argument, and I will mention them, without deciding whether any would be fatal if the equal protection argument were stated in the Supplemental Petition. First, the classification asserted by Dillard appears to be a classification between types of transfers, not a classification of persons. Second, A.R. 819 on its face appears to apply to all transfers, without distinction. Dillard has not attempted to show that this facially neutral regulation has a disparate impact on any group. Third, the State respondents state in their brief that A.R. 819 notwithstanding, no transferees are given hearings. It appears that A.R. 819 is honored not in the observance but in the breach, and even then only by transferred prisoners trying to establish a conditional liberty interest entitling them to a hearing under federal law. *Shango v. Jurich,* 681 F.2d 1091; *Chavis v. Rowe,* 643 F.2d 1281, 1290 & n. 8 (7th Cir.), *cert. denied,* 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981); *Stringer v. Rowe,* 616 F.2d 993.

**10.** Dillard's one-paragraph equal protection argument cites one judicial precedent, *Stringer v. Rowe,* 616 F.2d 993 (7th Cir.1980) (per curiam). In *Stringer* a prison inmate argued that his transfer between state facilities without a hearing violated the equal protection clause. Although there was no explicit allegation that other prisoners did receive pre-transfer hearings, the Court of Appeals held that Stringer had stated a legally sufficient equal protection claim. As I read *Stringer,* the Court of Appeals held that unequal treatment, a crucial element of an equal protection claim, reasonably could be inferred from other allegations of the complaint, particularly allegations that prison officials transferred Stringer to cover up improprieties in handling a disciplinary report lodged against him. Further, the Court appears to have relied on A.R. 819 and assumed that other prisoners generally were given pre-transfer hearings. *Id.* at 998. This conclusion, that in *Stringer* the Court assumed unequal treatment in ruling on the sufficiency of the equal protection claim, is supported by a review of *Durso v. Rowe,* 579 F.2d 1365, 1371–72 (7th Cir.1978)

(the only case relied on in this portion of *Stringer*), and *Ciechon v. City of Chicago,* 686 F.2d 511, 523 (7th Cir.1982) (paraphrasing the holdings of *Stringer* and *Durso*). *See also Shango v. Jurich,* 681 F.2d at 1103 (discussing *Stringer*).

In the present case it is inappropriate to assume unequal treatment. The Supplemental Petition does not allege that other prisoners are given pre-transfer hearings, nor can this crucial inference reasonably be drawn from the allegations that are made. Dillard submits A.R. 819 with one of his memoranda, but he makes no positive representation that hearings in fact are held under this regulation; meanwhile, the state respondents explicitly state that such hearings are not held, in spite of the regulation. (State respondents memo of August 10 at p. 3.) Under the circumstances, I cannot assume what petitioners have not alleged, namely, that other prisoners are given pre-transfer hearings. Dillard's equal protection argument fails, because his allegations do not support an inference of unequal treatment.

*Conclusion*

For the reasons stated above, I reject all of Dillard's arguments, and I deny his request for interlocutory relief. It is not clear whether there is anything left of this case. Although this order merely denies interlocutory relief, my rulings on the legal sufficiency of Dillard's claim should preclude final relief based on his transfer to Marion. The Supplemental Petition complains of threatened out-of-state transfers, and I have not ruled on the legality of such transfers. The parties' memoranda lead me to believe, however, that the remaining petitioners are in state facilities, and that neither Dillard nor they are threatened with imminent transfer out of state. If this is so, whatever remains to be decided may be moot. Counsel shall be prepared to discuss the future of this litigation at the scheduled status hearing on February 15, 1983.

The motion of petitioner Dillard for an order transferring him to state custody is denied.

It is so ordered.

